UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRENDA J. WITT,<br><br>                    Plaintiff,<br><br>       vs.<br><br>CAROLYN W. COLVIN,<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>                    Defendant. | 4:14-CV-04013-LLP<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Plaintiff, Brenda J. Witt ("Witt") seeks judicial review of the

Commissioner's final decision denying her payment of disability insurance

benefits under Title II of the Social Security Act.[1] Witt has filed a Complaint

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five step procedure under Title II and Title XVI).  In this case, Witt filed her application for Title II benefits only.  AR 19, 164-172.  Her coverage status for SSD benefits expired on June 30, 2012.  AR 21, 187.  In other words, in order to be entitled to Title II benefits, Witt must prove she is disabled on or before that date.

and has requested the Court to reverse the Commissioner's final decision denying her disability benefits and to enter an Order awarding benefits. Alternatively, Witt requests the Court remand the matter to the Social Security Administration for further development with instructions to (1) properly evaluate the opinions of her medical providers; (2) reassess her impairments and residual functional capacity ("RFC"); (3) reassess her testimony and credibility; (4) further develop the record with additional consultative exams, testing and expert vocational evidence as necessary; and (5) issue a new decision based on substantial evidence of the record as a whole and proper legal standards.  The matter is fully briefed and has been referred to this Magistrate Judge for a Report and Recommendation.  For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED and REMANDED.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g).  Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A)  and Judge Schreier's Standing Order dated October 16, 2014.

## STIPULATED FACTS[2]

### A.   Administrative Proceedings

This action arises from Plaintiff, Brenda J. Witt's, application for SSDI benefits protectively filed on February 1, 2011 alleging disability since May 28, 2007 due to cytomegalovirus[3], arthritis in neck and lower back, bilateral carpal tunnel, vision problems, depression, tremors, seizures, fatigue, shoulder problems, weakness in leg, obesity and fibromyalgia. AR 65, 164, 191, 193, 203-09, 220, 225, 226, 230, 231 (citations to the appeal record will be cited by "AR" followed by the page or pages).

Witt's claim was denied initially and upon reconsideration. AR 113,117. Witt then requested an administrative hearing. AR 123. Witt's administrative law judge hearing was held on October 18, 2012, by the Honorable Denzel R. Busick, ("ALJ").  AR 39.  Witt was represented by different counsel during the hearing. AR 39.  An unfavorable decision was issued on December 5, 2012.

---

[2] The stipulated facts were agreed upon and submitted by the parties. See, Docket 10.  The paragraph numbers have been deleted and a few headings have been altered by the Court. The parties referred to the Plaintiff by her first name but the Court refers to her by her surname.  A few grammatical and/or stylistic changes have been made.  Otherwise, the stipulated facts are recited in this opinion from the parties' submission.

[3] Cytomegalovirus, (CMV), is a virus that belongs to the herpes virus family. Most healthy children and adults do not experience any symptoms after infection with CMV.  However, in people with a weakened immune system, CMV may cause serious disease.  CMV can cause retinitis (blurred vision and blindness), painful swallowing (dysphagia), diarrhea, and weakness or numbness in the legs. See, http://www.medicinenet.com/cytomegalovirus_cmv/page2.htm#what_is cytomegalovirus_ cmv.  Last checked Jan. 29, 2015.

AR 16.  Witt amended her alleged onset of disability to November 19, 2010, at the hearing.  AR 19, 41.

The ALJ found Witt had not engaged in substantial gainful activity, ("SGA"), since the amended alleged onset date of November 19, 2010, through her date last insured of June 30, 2012. AR 21.  The ALJ found Witt had multiple severe impairments, that none of her impairments met or medically equaled a Listing, that she had the RFC to perform light exertion work with some additional postural limitations and pain issues. AR 21-4. Based on the RFC determined by the ALJ, the ALJ found that Witt was not able to perform her past relevant work, but other jobs existed in significant numbers so she was not disabled.  AR 30-1.

Witt timely requested review by the Appeals Council. AR 12. The Appeals Council considered the additional evidence Witt submitted, but denied her request for review, making the ALJ's decision the final decision of the Commissioner.  AR 6-10.  Witt then timely filed this action.

## B.    Witt's Age, Education and Work Experience

Witt was born in 1961 and was just shy of 51 years old at the time of the decision. AR 164.  Witt completed 12th grade in 1980. AR 192.  Witt had past work as a cook in a nursing home, AR 192, which the vocational expert defined as institutional cook, DOT 315.361-010, a skilled job with medium exertion. AR 237. The ALJ found this was Witt's past relevant work.  AR30.

4

**C.      Relevant Medical Evidence**

**1.      Rural Medical Clinics, PA- Kenneth Kirton, MD:**

Witt was seen by Dr. Kirton on 11/18/10 for a recheck on her tremors and gait instability. AR 262. Witt complained of weakness and fatigue and she was noted to be a little bit emotional. Id. Dr. Kirton noted a little bit of an intermittent facial tremor, a little bit of a resting tremor on the right side up and down more than side to side. Id. Witt's gait was unstable, a little wide based with more prominent issues than previous. Id. Her cranial nerves had a little tremor, her global strength was reduced, but symmetrical, and her cerebellar function seemed to be somewhat impaired with difficulty with ambulation, coordination, and a resting tremor. Id. Dr. Kirton's assessments included status post neurologic changes from encephalitis for which she was referred back to Dr. Zimprich, and low grade depression for which she was treated with Celexa. Id. On 11/26/10, Witt called complaining of ongoing tremors and requested a beta blocker, and was prescribed Propranolol.[4]

Witt saw Dr. Kirton again on 2/14/11. She had fallen and injured her left shoulder and neck two weeks earlier, and continued to experience intermittent tremors, severe fatigue, unsteady gait, low voice, low energy, and flat affect. AR 263. Dr. Kirton's findings included low voice volume, a very

---

[4] Propranolol is a beta-blocker used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions. See, http:/ /www.drugs.com/propranolol.html Last checked Jan. 29, 2015.

unsteady lilting or stilting gait, variable strength, some degree of resting tremor more prominent on the right, diminished coordination, left neck and shoulder with some discomfort to palpate diffusely, negative shoulder x-ray, and the neck x-ray shows reverse normal lordotic curve, with anterior bone spurs at 5 and 6 with what appears to be chipping of one of the spurs, and narrowed foramina at 5, 6, and 7 level. Id.; see also, AR 258 (neck x-ray report).

Dr. Kirton noted that he observed marked degenerative changes from the narrowing of the neural foramina, but did not see any fracture. AR 264.

Dr. Kirton's assessments included fatigue, coordination issues, history of CMV encephalitis, depression, and left neck and shoulder discomfort. AR 264.

Dr. Kirton indicated he discussed Witt's case with Dr. Zimprich and there were three possibilities: 1) patient is causing completely fictitious symptoms, 2) psychiatric disease is manifesting physical symptoms, or the most likely, 3) post CMV encephalopathy. Id.

On 3/3/11, Witt was referred by Dr. Kirton, at Dr. Zimprich's request, to Great Plains Psychological Services for a geriatric neuropsychological evaluation. AR 342. Psychological evaluations and detailed testing was performed and Witt was found to be alert and responsive, but sighing frequently and giving a negative appraisal of her own performance. Id. She required prompts to maintain attention to task, and the doctor concluded Witt exhibited poor effort, so testing was abbreviated. Id. Global functioning and orientation was minimally adequate, attention was erratic, and most findings were adequate. Id. The doctor found her conversational speech

6

was clear and coherent with borderline word-finding difficulties apparent in confrontation and generation naming tasks. Id. The doctor noted Witt's reports of everyday forgetfulness were consistent with mood and fatigue-related concentration lapses. Id. Witt's affect was quite flat and she reported a wide range of somatic concerns, including occasional spells of altered consciousness. Id. The doctor summarized that there was poor effort in the testing, depressed mood, and somatization was evident. AR 343. He concluded that Witt complained of fatigue, spells, and a wide range of somatic issues, but depression and feelings of abandonment likely underlie her invalidism. Id. The doctor stated he doubted CMV played any role in her actual debility. Id.

Witt next saw Dr. Kirton on 3/21/11 complaining of an inability to work due to variable functional status. AR 312. At times dragging of her left foot, slow speech and mentation at times, and also having some financial difficulties and struggles in her marriage. Id. Dr. Kirton's observations included flat affect, and variable strength. Id. His assessment was vague neuromuscular symptoms post CMV encephalitis, neuropsychological evaluation felt to demonstrate more psychiatric based, and psychosocial problems. AR 313. The plan was to obtain a second neurology opinion and counseling was recommended for behavior cognitive interventions. Id.

Witt saw Dr. Kirton again on 6/2/11 and confronted Dr. Kirton about her belief that at her last appointment she was left with the impression that

7

Dr. Kirton said she was imagining her symptoms. AR 316. Dr. Kirton explained

he had been discussing the finding of the neuropsychologist who concluded

there was a psychiatric component to the physical symptoms.  Dr. Kirton

stated it is his belief, and has been his belief, that Witt suffered an acute

neuralgic event 15 years earlier, most likely a viral CNS infection which altered

her nervous system and left her vulnerable to increased neuralgic problems

when fatigued or when her immune system is activated by acute illness, and

that indeed is the pattern that has occurred. Id.  Dr. Kirton stated Witt's

neuralgic complications have waxed and waned over that period and included

speech impairment, weakness, gait impairment, easy fatigability, and foot drop.

Id.  Dr. Kirton stated that other possibilities to explain her symptomology

would be an unrecognized neuralgic illness or disease, (one of the MRI's noted

the potential for a demyelinating process), or that her symptoms were a

manifestation neuropsychiatric illness. AR 316-17.  Dr. Kirton also stated

another possibility was someone consciously faking symptoms, but he

specifically stated he did not believe that was the case.  AR 317.  Dr. Kirton

noted he had provided a letter in support of Witt's disability claim and that he

felt the cause of her symptoms related to the earlier viral infection. AR 317-18.

Dr. Kirton provided details of the earlier viral infection occurring in

March 1994 in his referral request to Mayo Clinic, noting that Witt had been

hospitalized at Sioux Valley hospital; experienced loss of consciousness

followed by difficult arousability, altered speech, and altered sensation in her

hands and feet. AR 319. She was evaluated at the time by Dr. Opheim, a

neurologist. Id. A diagnosis of CMV encephalitis was made based on a positive IGM titer and a very [sic] titer of IGG during her hospitalization. Id. Dr. Kirton noted that since that time Witt had never completely recovered and struggles with easier fatigue manifested by slowing speech, impairment of her gait, strength, and mobility. Id. He noted that Witt has escalation of these symptoms when she has an acute infection, or is fatigued from physical exertion or emotional stress. Id. Witt's referral was accepted by Mayo Clinic, but she was placed on a wait list.  AR 322.

Witt was seen by Dr. Kirton again on 10/13/11 to discuss her recent rheumatology evaluation where she had been diagnosed with fibromyalgia.  AR 324. Dr. Kirton's neurologic exam revealed global weakness, foot drop on the left side, and somewhat dragging mobility. Id.  His assessment included vague diffuse neurologic process with fatigue, foot drop on the left side, ambulatory coordination impairment, occasional word finding issues, depression/anxiety, fibromyalgia, GERD, and chronic back issues.  Id.

Witt was seen on 11/15/11 for sinus congestion and a sore throat.  AR 374.  Witt saw Dr. Kirton again on 12/8/11 for a reoccurrence of her cough, and escalated symptoms of weakness, decreased mobility, and decreased global functional status.  AR 372. Additional antibiotics were prescribed.  Id.  She was seen a week later with diarrhea since taking the antibiotics, and had a little bit of tremor and weakness which Dr. Kirton noted was usual for Witt when she has an acute infection. AR 370. Her antibiotic was changed.  Id.

Witt was next seen on 2/24/12 with a reoccurrence of influenza. AR 368. Witt saw Dr. Kirton on 3/22/12 and was having to use a walker all the time because she had syncopal falls. AR 366. She was also experiencing some sleep irregularity and tremor, and her foot shuffling gait was more prominent.  Id. Dr. Kirton observed a little bit of resting tremor and intention tremor as well, and a shuffling gait using a wheeled walker.  Id.  Witt was seen again on 3/26/12 with complaints of sinus congestion with pain and headache, and antibiotics were prescribed. AR 364.

Witt saw Dr. Kirton again on 6/15/12 and she was still waiting for her Mayo referral appointment. AR 362. Witt complained of a one week onset of face pain, nasal congestion, and a low grade fever and achiness. Id. Antibiotics were prescribed.  Id. She was seen again on 6/28/12 with recurrence of nasal congestion and she was having a little bit of right-sided tremor, a little bit of left-sided weakness, foot drop on the left side. AR 360. Dr. Kirton stated she has definite physical findings of weakness and tremor, and noted decreased functional status on exam. Id.

Witt next saw Dr. Kirton for follow-up on 8/23/12 and Dr. Kirton's exam revealed a little bit of intention tremor, a little slurring of speech, and he observed she walked very slowly and deliberately. AR 355. She was wearing a foot brace on her left foot. Id.

On 10/4/12 Dr. Kirton completed a Physical Medical Source Statement and noted diagnoses of viral encephalitis, headaches, paresthesias, tremors with poor prognosis for improvement. AR 483. Dr. Kirton stated her symptoms

included variable slowed speech and mentation, chronic fatigue and motor weakness that increases with stress, tremors in upper extremities, right greater than left. Id. He also noted foot drop of a variable degree, and stated the tremors vary in intensity. Dr. Kirton also stated that emotional factors contribute to the severity of Witt's symptoms and indicated she has depression and anxiety. AR 483-4. Dr. Kirton stated Witt was limited to standing 15 minutes at one time and less than two hours in an 8-hour workday, but could sit at least six hours in a workday. AR 484. He said she would need to use a cane or other assistive device at times due to imbalance and weakness. AR 485. He stated she would need the ability to shift positions at will and would need to include periods of walking around. AR 484. Dr. Kirton felt Witt would need 2-3 unscheduled breaks of 30-45 minutes per workday due to chronic fatigue, pain and numbness. Id. Dr. Kirton said Witt was limited to lifting 10 pounds occasionally, 20 pounds rarely, and never 50 pounds, and only occasional twisting and stooping, and rarely climbing stairs, and never ladders.  Id. Dr. Kirton stated Witt was likely to be off-task 25% or more of the time and was only capable of low stress work. AR 486. Dr. Kirton explained that when Witt experiences either physical or emotional stress her symptoms escalate with fatigue and weakness followed by slowed speed. Id.

### 2.   Neurology Associates—Dr. Todd Zimprich

The first medical note for Neurology Associates which appears of record is a return visit for Witt on 12/1/10. AR 246. Witt complained of generalized tremors, improved pain in her left leg, but still numbness.  Id. The tremors

started following a respiratory infection and initially were noticed in bilateral upper extremities, but currently were more generalized.  Id.  Witt reported they affected her legs and her balance, and she had fallen several times because of the tremors.  Id.  Witt reported numbness in her upper extremities, and Zimprich noted that an EMG/nerve conduction study found mild median neuropathy at the wrist. Id.  She also reported mild neck pain and she had significant orthostatic symptoms and episodes of brief syncope. Id.  Witt also continued to have headaches almost daily. She reported visual disturbance she described as floaters, and also a sense of dizziness with both orthostatic and vertiginous components. Id.  Dr. Zimprich also noted that a prior brain MRI in 2007 revealed a mild Chiari-I malformation without evidence of hydrocephalus, and Witt had a presumptive history of a viral monophasic illness possibly related to CMV nearly 20 years earlier, which he had not been able to fully substantiate. Id.  Dr. Zimprich's exam noted Witt was tearful during the entire encounter, and revealed intermittent generalized tremor involving the bilateral upper and lower extremities, that has a distractible quality to it. Id.  Witt's straightaway gait was slightly wide based and lurching, although this gait dysfunction also had a distractible component to it. Id.  Dr. Zimprich's impressions included tremor, bilateral upper extremity paresthesias, headache, and syncope. Id.  He stated he was suspicious that the tremor was not organic in nature, but additional consideration should be given to neurodegenerative disorder such as spinal cerebellar ataxia or a process related to Witt's Chiari malformation. Id.  Dr. Zimprich also listed a variety of other possibilities and

12

proceeded with additional testing. Id; see, AR 260 (Autonomic Reflex Test-
normal); AR 261 (Lumbar MRI 10/8/10 revealed post-operative changes, and
some other findings, but page two of the report which presumably included the
impressions is missing from the appeal record).

Witt returned on 1/26/11 following additional tests which were
unrevealing with regard to her symptoms. AR 242. Witt complained mostly of
left lower paresthesias, a sense of weakness, and tremors, which worsen with
ambulation and improve with rest. Id.  Dr. Zimprich noted prior EMG/nerve
conduction tests in 2009 were suggestive of mild, chronic, left S1
radiculopathy, a lumbar MRI documented degenerative changes and post-
operative changes at L5 without clear neurogenic impingement.  Id.  The exam
revealed a flat affect, shaky with each step, and a sense of giveaway weakness
in the left hip flexors.  Dr. Zimprich stated he continued to suspect the majority
of Witt's symptoms were non-organic in nature.  Id. A repeat EMG/nerve
conduction test of her legs was ordered and Dr. Zimprich stated Witt will
require a neuropsychometric testing and psychiatric counseling. Id.
Dr. Zimprich referred Witt for physical therapy for her lower extremity
symptoms. AR 242, 275.

### 3.    Tiezen Memorial Home: Prairie Rehabilitation

Witt was referred to physical therapy to address lower extremity
weakness and gait disorder by Dr. Zimprich on 2/7/11. AR 275. Her initial
evaluation occurred on 2/11/11 with an initial diagnosis of bilateral lower

extremity decreased strength and coordination, difficulty walking, decreased balance, and fall risk. AR 272. Witt was observed to have an extremely unstable gait and poor control of her limbs. AR 272. Witt also reported pain in her neck and low back and a recent fall. Id. Witt's abnormal range of motion was attributed to issues with strength, tremors, and fatigue, but was not formally measured at the exam. AR 273. Neurological testing revealed decreased sensation in her left lateral foot and bilateral tremors present at both rest and with intention. Id. Witt's gait was very sporadic and presented with numerous abnormalities including decreased bilateral hip and knee flexion and decreased bilateral toe off.  Id. The physical therapist stated it was unsafe for Witt to walk independently and gave her a front wheeled walker.  Id.  The therapist also noted that Witt's speech was impacted. Id.

Witt completed an intake form and noted that her doctor restricted her to lifting 10 pounds regularly and 20 pounds occasionally due to her lower back and upper neck degenerative arthritis.  AR 268. Witt stated she could work while sitting for about 20 minutes, do a little vacuuming, and work at the kitchen sink, but could not do repetitive lifting, mow the lawn, or lift overhead repeatedly.  AR 269.

The appeal record contains physical therapy records from 2/11/11 to 3/14/11.  AR 266-67. The subjective comments note that Witt generally felt she was getting stronger, and the objective notes for the last visit state that Witt's balance has improved at the onset of her PT session, but when she fatigues her balance decreases. AR 267.

14

### 4.    Sanford Neurology Clinic

Witt saw Dr. Basel Salem on 5/13/11 complaining of left leg weakness, headaches, and neck pain. AR 314. Dr. Salem's examination revealed flat affect, mild decreased sensation in several extremities without clear distribution, very mild tremor in both hands, slight positive Romberg test, and motor exam showed good strength in upper and lower extremities. Id. Dr. Salem's assessment noted that he highly suspected a psychogenic component driving most of Witt's symptoms.

Witt cancelled further testing with Dr. Salem because of a planned referral to Mayo Clinic. AR 303.

### 5.    Sanford Women's Health

Witt was seen at Sanford Women's Health by Dr. Bhatia to establish care on 4/7/11. AR 277. The examination revealed that Witt was using a walker to ambulate, she had difficulty changing posture, difficulty moving from the chair to the exam table, a nonspecific weakness of the left leg, she needed assistance lying down and getting up. AR 280. Witt complained of neck and shoulder pain and x-rays were ordered to rule out underlying bone problems. Id.  The shoulder x-rays revealed minor degenerative changes, (AR 286), and the cervical spine x-rays revealed multilevel degenerative changes with spinal straightening, which Dr. Bhatia described as extensive. AR 287, 290.

Dr. Bhatia's records indicate she reviewed an MRI obtained on 5/20/11 and noted degenerative changes with some compression effect on the spinal cord. She noted the importance of keeping her appointment with the

neurologist. AR 463. The 5/20/11 MRI does not appear in the appeal record.
Dr. Bhatia also referred Witt to a rheumatologist due to complaints of achy
feet, joints, and hips. AR 463.

Following the rheumatology exam where Witt was diagnosed with
fibromyalgia, she saw Dr. Bhatia again on 10/4/11 to follow up on chronic
pain and fibromyalgia. AR 447. Witt continued to complain of persistent left leg
weakness and foot drop with prolonged use of the leg. Id.  She complained of
pain in her lower back and joints. Id.  Dr. Bhatia's exam noted Witt had trouble
getting up from a sitting position and does have obvious left leg weakness with
left foot drop on walking, and was using a walker. AR 448.  Witt was already
taking Topamax for her migraines and Celexa for depression, and Celebrex was
added for pain. AR 447-48. Witt also continued with physical therapy. AR 439,
443.

Witt was seen on 4/11/12 for her annual exam and complained of
excessive fatigue since having the flu in January.  AR 413. She also complained
of ongoing dizzy spells, she feels tired and weak and almost passes out, and
also persistent leg weakness. Id.  Examination revealed left leg weakness,
presence of a brace and slow and guarded gait with no change from previous
exam.  AR 415. Witt was referred to Dr. Susan Assam, Physical Medicine and
Rehabilitation. AR 415, 421.

**6.    Avera Rheumatology Clinic**

Witt was seen at Avera Rheumatology on 9/1/11 for widespread pain.
The rheumatologist obtained Witt's history, and Witt's subjective complaints

16

including fevers, fluctuating weight, fatigue, weakness, redness in the eyes, episodes of chest pain, some leg swelling, shortness of breath, abdominal pain, urination difficulties, stiffness and generalized pain and tenderness, foot sensitivity and pain, intermittent tingling, depression, daytime  sleepiness, swollen glands, and anemia. AR 337. The exam found mild tenderness across PIP and MCP joints without swelling, mild tenderness in the wrists, tenderness up and down the forearms and elbow, normal range of motion, mildly tender MTP squeeze, and normal strength.  AR 338. Witt had normal range of motion of the hip, knee, and ankle. AR 338. Tender point exam revealed widespread tenderness of all fibromyalgia tender points. Id. The rheumatologist's impressions were fibromyalgia with widespread pain, fatigue, nonrestorative sleep, and reduced exercise tolerance; generalized arthralgias; longstanding neurological symptomology; early arthritis particularly in the feet; and degenerative disc disease in the cervical and lumbar spine.  AR 336. Witt was directed back to her primary care physician to discuss medication options. Id. No rheumatology follow-up was recommended.  Id.

### 7.    Michael McGrath, PhD, Consulting Exam

Witt was seen by a psychologist on 8/18/11 for an assessment of her psychological functioning based on a review of records, and a clinical interview at the request of the state agency evaluating her disability claim. AR 305. No psychological testing was performed.  Id. The report indicates  records were reviewed, but the report does not document what was reviewed and only

17

references an Adult Function Report from February 2011, a 1/26/11

exam by Dr. Zimprich, and a 5/13/11 exam by Dr. Salem. AR 305-06.

Dr. McGrath's interview noted Witt told him she loved her job, loved to

work, but she can't maintain a 40-hour week because of problems related to

prior encephalitis, prior back surgery, left leg numbness, fatigue, foggy brain,

limited sitting and standing ability, and an inability to do repetitive work due to

carpal tunnel and neck problems. AR 306. Witt reported that she is frequently

alone at home because her husband is a trucker, but her son and a girlfriend

check on her frequently. AR 307. She attends physical therapy twice per week

and will nap in the afternoon, especially if she attended physical therapy that

day. Id.  Witt said she crochets usually daily until her hands get "icky."  She

orders her groceries over the phone and her son picks them up. Id.  Witt does

not usually go to stores because of her foot drop. Id.

Witt told Dr. McGrath that she has never been psychiatrically

hospitalized, but has been seeing Kathy Sazama MS for individual therapy

since March 2011.  AR 309.

Witt said she was treated for depression following her back surgery in

2008, but denied significant problems with anxiety, thought disorder, mania,

or obsessive-compulsive disorder ("OCD"). AR 309. Dr. McGrath assessed her

GAF at 65 without any axis II diagnoses. Id.  Dr. McGrath's conclusion noted

Witt's denial of any dysphoria, despite having disruptive physical symptoms,

raises some suspicion of somatoform disorder. AR 310.

18

### 8.    Vision Care Associates

In a letter following a 4/29/10 eye examination Dr. Feser stated Witt had early macular degeneration, epiretinal membrane, an old corneal scar, and also stable visual field loss in each eye. AR 247.

The appeal record contains a single field analysis, Central 24-2 threshold test performed on 3/26/10 with numbers and shading indicating findings represented graphically of some sort in various quadrants for both Witt's left and right eye. AR 248-9. No narrative explaining the findings is included.  Id. Witt was seen for an exam on 9/12/12 and the exam record has hand-written notes that her eyes were itchy, and she was not seeing as well, hard to thread a needle. AR 389.  The same record later has a 2/6/13 date written.  Id.  Under diagnosis 1 "visual field defect" is written, but it appears to have a line through it. Id. Two additional number "1" are listed which look like "1 OC HTN" and "1 IOP stable."  Id. There is no narrative to further explain these notations. Id.

The appeal record contains a single field analysis, central 24-2 threshold test performed on 3/16/11 with numbers and shading indicating findings represented graphically of some sort in various quadrants for both Witt's left and right eye. AR 390-l. No narrative explaining the findings is included. Id. Additional similar test results exist from the same tests performed on 3/14/12. AR 392-3.

An exam record from 3/14/12 has numerous indications on various diagrams, and lists diagnoses as K-opacity OS-stable; Drusen- status

19

unintelligible; ERM OS-stable; Vis. Fields def. -stable today, with additional
unintelligible comment; and All conj.- status unintelligible. AR 394. Additional
unintelligible comments are written under the diagnoses. Id.  Exam records
from 9/29/10, 10/5/11 and a record with multiple dates have similar findings
with most of them unreadable, but again listing "visual field def." AR 395, 397,
401.

### 9.    Advanced Orthogonal Chiropractic

Witt received chiropractic care on 7/28/11 and 9/14/11 for pain in her
low back, right buttock, left hip, left foot, neck, shoulders, and headaches.
AR 334. The chiropractor found posterior displacement of C1 on the right with
very severe restricted motion, and posterior displacement of C2 vertebral
segment on the left with very severe joint fixation. Id.  Additional findings were
noted at T3, and L5. Id.

### 10.    Physical Medicine Rehabilitation Specialists

Witt saw Dr. Susan Assam by referral on 4/19/12 for extremity
weakness, muscle pain, and arthritis. AR 344. Witt complained of continued
difficulty walking since her pneumonia due to difficulty with her left leg.
AR 345. Dr. Assam noted she was wearing an ankle-foot orthosis requested by
the physical therapist. Id. Witt also complained of some neck and upper back
pain, and her hands felt tingly and numb. Id. Dr. Assam's exam revealed
obesity, very abnormal gait, tending to drag the left foot forward, shaking of the
left leg during trying to do a single leg stance, crepitus in the knees bilaterally,
very tender to any part of the body touched, very tender to palpation, tightness

especially in the left trapezius, limited range of motion in the back and neck
due to pain, speech is very slow, somewhat tangential but facies are
symmetrical and speech is just slow, and edema in both lower extremities.
AR 345.

Dr. Assam's assessment was generalized weakness, neurologically left
greater than right with multiple fibromyalgia points. Id. Dr. Assam stated that
in regard to Witt's ability to work her balance would be very unsafe.  Repeating
her neuropsychometric testing was recommended because Witt seemed quite
slow cognitively, and fibromyalgia "surely fits her picture and I think that
would be very limiting for her." AR 345. Dr. Assam noted that Witt had a
walker and her ankle-foot orthosis for her left foot was appropriate, and the
Mayo Clinic referral would be beneficial. AR 346. No follow-up was scheduled.
Id.

**11.    Family Solutions Center / Wellspring Holistic Care Center**

The appeal record contains counseling records from 3/22/11 to
10/2/12. AR 472-82. Large portions of the records are very faint and difficult
to read, and the notes contain only initials of the treatment provider.  Id.  The
initials appear to be KS, which would be consistent with the therapist Witt
identified in her Disability Report. See, AR 232. The records are difficult to
read, but do contain observations of some of Witt's symptoms including,
10/2/12-reported fatigue and difficulty walking, (AR472); 6/5/12- walking is
fair, some stability issues, experiencing fatigue, (AR473); ?/28/12- overall feels
pretty good, looks forward to Mayo, wants on disability because she is unable

21

to work because fatigue wears her down, (AR 473); ?/24/12- discusses neck pain issues, trouble with mobility, would like to receive disability, (AR 474); 8/16/11- feeling better, walking an issue and neck pain, (AR 475); 8/30/11- complains of physical pain, stiff and sore, tearful, (AR 475); 9/20/11 - diagnosed with fibromyalgia, stiff, having walking and balance issues, sometimes struggles with depression and anxiety, but for the most part does well managing it, (AR 475); 10/11/11- continued difficulty with pain and discomfort, (AR 475); 4/26/11-continues to struggle with pain, depression and difficulty with mobility, (AR 476); 5/10/11-reports improved mobility in her neck, has pain but is managing, (AR 476); 6/7/11- expresses concern about pain and discomfort, (AR 476); 3/29/11 - ongoing issues walking, fainting, neck pain, presents with personality disorder passive style (AR 477).

The mental status exam performed on 3/22/11 notes Witt appeared older than her age, was tense, cooperative, motor behavior was slowed with tremors, speech was soft, good eye contact, Witt was responsive but with flattened affect, thought production was relevant and content contained persecutory trends, and the diagnoses listed were: 311 (depressive disorder NOS), and 301.9 (personality disorder). AR 478. See, http://allpsych.com/disorders/disorders_ dsmIV codes.html. Last checked Jan. 29, 2015.

### 12.  Mayo Clinic

Witt was referred to Mayo Clinic and finally seen in September 2012 in a number of Clinics. On 9/24/12 Witt had an overnight oximetry test which was

abnormal showing periodic fluctuations in oxygen suggestive of sleep disordered breathing.  AR 502.

On 9/25/12 Witt was seen by Dr. Cowl in the Pulmonary and Critical Care Clinic. AR 498.  Dr. Cowl's notes summarize Witt's medical history based on his interview and a review of more than 200 pages of medical records. AR 498-99. Dr. Cowl's exam revealed Witt was moderately overweight, a brace on the left lower extremity, and gait slightly unsteady. AR 500. Dr. Cowl recommended seeing the neurology and infectious disease specialists. Id.

Witt then saw Dr. Weinshenker, a neurologist. AR 494. The examination revealed a score of 32/38 on the short mental status test with the remainder of the neurologic exam unremarkable.  AR 495. Witt had give-way weakness of the ankle and toe extensors, some decreased vibration sense at the great toes, and her gait was antalgic with some tendency to shuffle the left foot. Id.  Witt was markedly tender over multiple myofascial trigger points. Id.  Dr. Weinshenker's impressions were that the left leg weakness was primarily give-way, she has some crepitus of the left knee and may well have some osteoarthritis contributing to her pain, the markedly tender trigger points were highly suggestive of fibromyalgia, and the abnormal overnight oximetry was possibly suggestive of sleep-disordered breathing.  Id.  He recommended a referral to the Fibromyalgia Treatment Center.  Id.  Dr. Weinshenker stated he could not comment whether she ever had CMV encephalitis, but he did not think it would contribute to her current problems. Id.

Witt also saw psychologist Richard Seime. AR 487. Dr. Seime concluded that Witt was not currently depressed, and not highly health anxious. AR 490. He agreed with the recommendation to pursue the fibromyalgia treatment program, stating he thought she was an ideal candidate for the Fibromyalgia Treatment Center Program, which was a short program over several days that could assist her in gaining some coping skills that she could apply at home. Id.

Witt's final diagnoses included probable fibromyalgia and a recommendation to the comprehensive fibromyalgia treatment program. AR 492. Other diagnoses included hypertriglyceridemia, periodic lower extremity spasms and imbalance associated with cognitive slowing, degenerative joint disease, obesity, and probable sleep-related disordered breathing. Id.

Witt returned to Mayo to the fibromyalgia program and was seen on 10/24/12.  AR 510. Witt complained of widespread pain, fatigue not improved by rest, feeling like she has a "mushy" brain on some days with the pain and fatigue aggravated by overexertion, physical activity, repetitive motion, stress, weather changes, poor sleep, prolonged sitting and prolonged standing. AR 511. Under functional status it was noted that Witt described her current status as limited in housekeeping requiring lifting, exercise, work, driving, and shopping, and reported being unemployed for 5 years, and watches a two-year old baby 2-3 days per week for three hours. AR 512. Other fibromyalgia criteria found were tender or swollen cervical or axillary nodes in the past six months, headaches, and unrefreshing sleep. AR 511. Witt also reported difficulty

24

concentrating, organizing thoughts and feelings of mental fogginess. Id.  Tender points were positive for all 18 locations. AR 514. The physical exam included musculoskeletal findings including: independent gait was unsteady, walks to stiff legs, unable to squat and rise, range of motion is limited in upper extremities and cervical spine related to pain, normal and symmetrical strength in all major muscle groups of the upper and lower extremities.  AR 509.

Based on the exams at the Mayo Clinic Fibromyalgia Treatment Center, Witt met both the 1990 and 2010 American Academy of Rheumatology's criteria for fibromyalgia.  AR 509. Treatment options and medication options were reviewed. AR 509-10. The final diagnoses from Mayo Clinic were fibromyalgia, depression, and abnormal sleep oximetry. AR 505. Given Witt's symptom severity the Mayo physician stated she would benefit from intensive and psychological rehabilitation through participation in Mayo Clinic's 3 week Comprehensive Pain Rehabilitation Center program. AR 510. Witt was not interested in the program, but an order was placed if she decided to pursue it in the future. AR 510. The physician also stated Witt would be a good candidate for physical therapy due to her difficulty ambulating, and she would benefit from occupational therapy for recommendations on energy conservation. AR 510.

### 13.    State Agency Assessments:

The state agency mental health experts evaluated the file on 8/5/11 and 11/26/12, and concluded both times that Witt had a severe mental impairment of affective disorder, and had mild limitations in activities of daily

25

living, social functioning, and maintaining concentration, persistence or pace, and no repeated episodes of decompensation. AR 70-1; 82.  Despite identifying a severe impairment of affective disorder, no mental RFC appears in the appeal record from either state agency mental health expert.

On 7/12/11 the state agency physical expert reviewed the file and concluded that Witt could perform essentially light exertion work with only occasional climbing ramps/stairs, balancing, and stooping, and never climbing ladders, ropes, and scaffolds. AR 73. The expert explained that Witt's lower extremity weakness and paresthesias along with tremors would cause the postural limits. Id.

Upon reconsideration another state agency physical expert reviewed the file on 1/28/12 and also adopted essentially a light exertion RFC, except he identified different postural limits. AR 85. The second expert said Witt was not limited to occasional balancing, but instead had no balance limitation at all. Id. The second expert also said that Witt was not precluded from climbing ladders, ropes, and scaffolds, but could climb them up to one third of the work day, or occasionally. AR 84. This expert stated the limitations were due to chronic neck/back pain related to degenerative disk disease, and she also had somewhat generalized arthralgias/myalgia, and noted that she was diagnosed with fibromyalgia. Id.

**D.     Hearing Testimony**

**1. Witt's Testimony**

Witt testified that she was 50 years old, has been married for 32 years and her husband is a truck driver. AR 43-4. She said she is 5'9" tall, weighed 250 pounds, and was right-handed. AR 44.

Witt testified her husband is gone most of the time, but she gets help from a friend who comes in and helps her cook, and her son brings home her groceries which she orders on the phone. AR 57-8. She said her daughter also helps her. AR 58.

Witt said she graduated from high school and had some CNA type training, but was not currently certified. AR 44.

Witt testified she last worked at an assisted living center as a med aide, caregiver, and CNA. AR 45. She said she had worked there for approximately five years, and had worked there previously also. Id.  Witt said she had to help lift residents at times, and the med cart and food cart had to be pushed around and weighed 50 pounds or more. AR 46. She said the job ended when she had chest pain and ended up with an episode of muscle spasms, brain fatigue, cognitive episode, tremors, leg weakness, and was in therapy for four to six months at Acucare in Sioux Falls. Id.  Witt testified she would love to be able to return to work, she misses her job. AR 59.

Witt testified that she never fully recovered from a neurologic episode she had in 1994, and her left side has weakness. AR 47. She said her left leg is

most affected, but her left arm is weak up through her neck, and she has fogginess in her head. Id.

Witt testified in 2007 she had pneumonia and that it went away, but she was totally fatigued, sleeping 12 to 16 hours per day, had weakness and fogginess in her head, her speech was slurred, memory was bad and she wasn't walking. AR 47-48. She said her leg was also dragging or sliding. AR 48. She said she was in therapy from February 2011 until December and now has a leg brace to help with her foot drop. Id.

Witt said she improved with therapy but not enough to work and she still tires easily, her leg is still weak and drags when she is tired, and she has tremors when she is tired.  AR 49.   Witt testified she had back surgery in 2008, which helped with the severe back pain, but she had a numb foot, and she still has tingling and the foot still goes numb sometimes. AR 50.

Witt testified she was limited to walking less than around a block, and she uses a walker which she was given in therapy in February 2011. AR 50. She does not use it around the house because she has furniture or a wall to hang on to, but uses it if she goes out or is in the yard. AR 51.

Witt testified she could only sit for 20 to 30 minutes before needing to get up and move around for five to ten minutes. AR 52. She said she could only stand 20 to 30 minutes because her foot goes to sleep. Id.  Witt testified that she no longer drives because the doctors were worried she was not safe. AR 51.

Witt testified she tried taking Lyrica but had a reaction, so she was taking Celebrex for her arthritis and it helps. AR 53. She said she also takes

28

Topamax for migraines.  When asked, Witt agreed that the Topamax controls her migraines for the most part. Id.

Witt testified she was diagnosed with fibromyalgia in September 2011, but had similar symptoms back to 2007, and was scheduled to go back to Mayo for a complete fibromyalgia work up. AR 52-3. She said her pain is worse a couple of days per week, and on those days she can't get housework or anything done. AR 55. She said she continues to have brain fog which affects her memory and concentration. AR 56.

Witt testified that since an eye infection in 1994 she has problems with her eyes and is followed every three months for early macular degeneration, and she has a large blocked area in her vision, which requires some action on her part which she demonstrated in the hearing to get a complete view. AR 54.

### 2.    Vocational Expert Testimony

The VE testified that Witt described two additional positions at the same employer, certified medication technician, which is semi-skilled and medium exertion, and nurse assistant or nurse aide, which is semi-skilled and medium exertion. AR 60.

The VE then testified that the job he described in his summary and in his testimony were consistent with the Dictionary of Occupational Titles. Id.

The first hypothetical asked by the ALJ, which he stated was to "assume initially as the DDS did," was light exertional work with only occasional climbing stairs slowly with a hand rail, no climbing ladders, scaffolds or ropes, only occasional crouching, kneeling, stooping or crawling, but could frequently

29

balance. AR 60. Also, no manipulative limits, no visual limits, no communication limits, no reaching limits, but would likely have some pain and discomfort of a chronic nature that would be present most of the time, however with appropriate medication they could be active at these limits, nonetheless they would have some mild limits on activities of daily living, social functioning, and concentration persistence and pace with mild defined as slightly affected but not materially affecting work-like activity. AR 60-6l. The VE testified this would preclude past work. AR 61. The VE also testified that none of Witt's skills would transfer to light work. Id.

The ALJ then asked if there would be light or sedentary unskilled work that person could perform. Id. The VE testified that the person could do the light jobs of cashier II, sales attendant, and survey worker. AR 61.

The ALJ then asked a second hypothetical where the person was reduced to sedentary exertion work with everything else the same. AR 62. The VE testified the person could perform the unskilled sedentary jobs of final assembler, bonder semiconductor, and call out operator. AR 62.

The ALJ then asked the VE about a person limited to the extent testified to by Witt, for example where two times per week they would need to leave work early due to a stamina problem, and the VE testified they would be unable to perform any kind of employment. AR 62-63.

**E.    Other Evidence**

Witt met with a state agency employee on 2/25/11 as part of her application process. AR 188-89. The state agency employee observed that Witt

was using a walker to assist in getting around, moved slow, appeared unsteady, shaky on her feet, and her sister helped her to sit/stand. AR 189.

In an undated Disability Report Witt stated she had cytomegalovirus, arthritis in neck and lower back, carpal tunnel in both hands, and vision problems. AR 191. Witt completed a vision questionnaire in February 2011 in which she stated she has "floaters" and a "huge blind spot". AR 198.

Witt completed a Function Report in February 2011 in which she answered Yes and No as to whether she prepares her own meals, she stated she gets help cooking from friends because she has problems standing, she gets tired and shaky, and she does makes sandwiches, soups, and heats meals others bring in. AR 204. Witt stated she can put in a load of laundry, then usually has someone help with getting it out. Id. She also gets help with the housework. Id. She said she does not drive because she is not supposed to because she gets tired and can't see well enough, or concentrate on all the things going on. AR 205. She said she reads, crochets, and sews some, but not real long because it makes her back ache. AR 206. She explained she sews daily, except on the days she has therapy because she is too tired. Id. Witt stated she visits on the phone with friends and family, sews with her friends, and stated she does these things, "daily, weekly." AR 206. She said she could lift 10 pounds, but not when she is using her walker. AR 207. She said she could walk five to ten minutes before needing to rest, and has trouble paying attention depending on how tired she is. AR 207. Witt stated her walker was

prescribed by her therapist, and she uses it as she tires, when she walks to be safe, because she has fallen too many times. AR 208.

Witt completed another undated Disability Report and stated that she has to rest between showering and dressing, she stops and rests between each thing she does, her hand hurt, and she needs help to clean house and fold laundry, still can't drive, do her own shopping or lift anything heavy. AR 225.

The VE completed a report titled Past Relevant Work Summary before the hearing in which he identified Witt's past work as an institutional cook, a skilled medium exertion job. AR 23- 7.

Witt's sister completed a Third Party Function Report in July 2011 in which she stated Witt did laundry, some "cleaning- dishes", and stated Witt does it slow and not as often as you usually would, and Witt gets help cleaning, doing dishes, and helping to prepare food, 3-4 times per week. AR 212.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a rubber stamp for the [Commissioner's]

decision, and is more than a search for the existence of substantial evidence supporting his decision." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Woolf, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Id. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or

33

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.  The ALJ applies a five step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary.  Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

> **Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.   This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

> **Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled

without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled.   20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow her to meet the physical and mental demands of her past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with her age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.   **Burden of Proof**

The Plaintiff bears the burden of proof at Steps One through Four of the Five-Step Inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt,  204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

35

**D.    The Parties' Positions**

Witt asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act.  She asserts the Commissioner erred in three ways:   (1) The Commissioner's RFC determination is not supported by substantial evidence; (2) The Commissioner failed to properly evaluate the medical evidence; and (3) The Commissioner failed to properly evaluate her credibility.  The Commissioner asserts substantial evidence supports the ALJ's determination that Witt was not disabled during the relevant time frame, and the decision should be affirmed.

**E.    Analysis**

Witt assigns three points of error to the Commissioner's denial of benefits.  They are discussed in turn below.

**1.  The Commissioner's RFC Determination**

Witt asserts the ALJ's formulation of her RFC was flawed in several ways. Specifically, Witt asserts:  (a) the ALJ did not sufficiently incorporate her balance problems into the RFC; (b) even though the ALJ acknowledged Witt's fibromyalgia as a severe impairment, he did not properly incorporate her fibromyalgia-related limitations into her RFC because he improperly evaluated her fibromyalgia condition by insisting upon objective evidence of its existence; (c) the ALJ failed to indicate whether he did or did not consider Witt's CMV a medically determinable impairment; (d) the ALJ acknowledged Witt's Chiari I malformation was a severe impairment, but failed to incorporate any corresponding limitations into the RFC.

36

The ALJ's formulation of Witt's RFC begins on page six of his written opinion.  AR 24.  He determined Witt was capable of light duty work but could only climb stairs occasionally and slowly with a hand rail and could never climb ladders, scaffolds or ropes.  She could balance frequently, but crouch, kneel, stoop and crawl only occasionally.  She had no manipulation, visual or communication limits but should avoid exposure to unprotected heights, and dangerous machinery.  AR 24.  The ALJ determined Witt's medically determinable impairments could cause her pain complaints but that her complaints were "not credible insofar as they are inconsistent with the above RFC assessment."  AR 25.

In support of this conclusion, the ALJ cited several of Witt's medical records and visits.  The ALJ began with Witt's December, 2010 visit to her neurologist (Dr. Zimprich) AR 246.  At that time, Witt exhibited a bilateral tremor in her upper and lower extremities with a "distractible quality" to it, but Dr. Zimprich gave Witt the benefit of the doubt in assuming an organic quality to the tremors. AR 245.  The ALJ also cited a re-examination by Dr. Zimprich (mistakenly referred to as Dr. Kirton by the ALJ) in January, 2011.  AR 242-43.  Extensive evaluation was unrevealing.  Id.  Muscle strength was normal.  AR 242.  Next, the ALJ cited Witt's visit with her family doctor (Bhatia) on April 7, 2011.  AR 277-80.  Witt used a walker to ambulate and had difficulty changing position.  She had nonspecific weakness in her left leg.  Her mood and affect were normal and her reflexes were normal.  AR 280.  The ALJ concluded

"regardless of her presentation during the examination, the overall record does not support a finding of inability to perform light duty activities."  AR 26.

The ALJ also cited Witt's neurological evaluation on May 13, 2011 by Dr. Salem.  AR 300.  Her physical exam revealed intact mental status, flat affect, and good strength in the upper and lower extremities.  AR 300.  She exhibited a mild tremor in both hands and her reflexes were symmetric.  Id. Dr. Salem suspected a psychogenic component to Witt's complaints of chronic headache, neck pain, left leg weakness and pain, hand tremors, and memory problems.  AR 301.

The ALJ noted Dr. Kirton's long medical note dated June 2, 2011 (AR 381-83) which was very supportive of Witt's disability claim.  The ALJ rejected this note, however, because "there was no significant physical assessment performed at that time."  AR 27.  "Thus, the undersigned does not accept this assessment as it is not consistent with the record generally."  Id.

The ALJ cited as an example of such inconsistency Witt's September 1, 2011 examination by rheumatologist Dr. Mumm.  AR 27.  Dr. Mumm's note is found at AR 336.  The ALJ concluded Dr. Mumm's "objective findings were consistent with no greater limitation than allowed for in the established RFC." AR 27.  Dr. Mumm's physical examination revealed mild tenderness across the PIP and MCP joints, no swelling, and normal range of motion.  Her elbow was tender but again range of motion was normal.  AR 338.  Her shoulder was also painful, but range of motion was again normal.  Tender point exam revealed widespread tenderness of essentially all fibromyalgia tender points.  AR 338.

38

Although her effort was "questionable" Dr. Mumm opined Witt's strength exam

was normal.  AR 338.  Dr. Mumm's impression was that Witt suffered from

(1) fibromyalgia with widespread pain, fatigue, nonrestorative sleep, and

reduced exercise tolerability; (2) generalized arthralgias with completely

reassuring joint exam,  doubtful of inflammatory arthritis or connective tissue

disease; (3) longstanding neurological symptomology with fairly reassuring

workups by Dr. Todd Zimprich and Dr. Salem; (4) early osteoarthritis

particularly in the feet and (5) degenerative disc disease.  AR 336.

The ALJ noted Witt's October 4, 2011 visit with family doctor (Bhatia) as

a contrast to her visit with the rheumatologist.  AR 27.  This medical note is

found at AR 447.  Dr. Bhatia noted no objective reason for Witt's left leg

weakness had been found.  AR 447.  During this visit, Witt complained of lower

back and joint pain.  Id.  She indicated she was doing well on Topomax for her

migraines and depression.  Id.  She was in a cheerful mood and in no acute

distress.  She had trouble getting up from a sitting position and had obvious

left leg weakness with a left foot drop.  AR 448.  She was using a walker to get

around.  Id.  Dr. Bhatia's assessment was chronic pain, fibromyalgia,

migraines, and depression.  Id.  The ALJ also cited as an inconsistency in

Witt's medical record her visit with Dr. Bhatia on April 11, 2012.  That record

appears at AR 413.  The purpose of the April 11, 2012 visit was an annual

"well woman exam" including a pap test.   AR 415.  During that visit, Witt told

Dr. Bhatia she'd had excessive fatigue since January and dizzy spells that last

a few minutes for the past two years.  Id.  Her musculoskeletal exam showed a

normal range of motion and she exhibited no swelling or tenderness.  Id.  She complained of persistent leg weakness, although was able to walk a mile one year ago but could now barely accomplish her activities of daily living.  AR 413. The ALJ determined this statement rendered Witt not credible, (AR 27) because a different provider (physical therapist Teveldal) opined one year previous in February, 2011 that Witt could not walk independently in a safe manner.  AR 273.  The ALJ also noted that during this visit with Dr. Bhatia, Witt's range of motion was normal and she exhibited no swelling or tenderness.  AR 28, 415. Dr. Bhatia's assessment remained fibromyalgia, chronic pain, and fatigue.  AR 415.

Next, the ALJ cited Witt's visit to Dr. Susan Assam on April 19, 2012. AR 28.  That medical record is found beginning at AR 344.  Witt's examination that day revealed a very abnormal gait with a left forward foot drag. AR 345. Her right foot was stable but the left shook on a single leg stand.  Id.  Her shoulders, elbows, wrists, hips, knees and ankles all had full range of motion. Id. She was tender to any part of the body that was touched.  Id.  Her speech was slow and she did have swelling in the lower extremities.  Id.  Dr. Assam's impression was generalized weakness, neurologically left greater that the right with multiple fibromyalgia points.  Id.  The ALJ found this exam inconsistent with Witt's well woman exam one week earlier with Dr. Bhatia and determined that Dr. Bhatia's well woman exam "more accurately reflects her functioning and this is generally consistent with the records from Family Solutions Center." AR 28.

40

Next, the ALJ discussed one note from Witt's nineteen-month counseling history at Family Solutions.   AR 28.  Those handwritten records span from March 22, 2011 through October 2, 2012, and appear at AR 472-482.   The ALJ cited the June 5, 2012 note as quoting Witt saying she feels "pretty good" however it appears this quote is from the _?_/28/12 note.  Despite stating she felt "pretty good" Witt also indicated she was looking forward to going to Mayo because she "wants on disability.  Believes she is unable to work as she fatigues and wears down."  AR 473.  From this the ALJ concluded "over time, the claimant's primary focus appears to revolve around seeking disability rather than trying to determine her true capacity to engage in basic work activities." AR 28.

The ALJ again referenced Witt's treatment with her primary care physician (Dr. Kirton) between September, 2011 through August, 2012.  AR 28.  These records appear at AR 354-387.  The ALJ acknowledged Witt demonstrated "variability in functioning" and that she presented with "slow and shuffling gait as well as some slurring of speech."   AR 28.  He concluded, however that her neurologic symptoms were vague in nature and that Dr. Kirton's records were inconsistent "with the above-referenced June 5, 2012 visit to Family Solutions counseling where she acknowledged she was functioning fairly well."  AR 28.

Next, the ALJ discussed Witt's multi-system evaluation at Mayo Clinic which occurred on September 26, 2012.  AR 29.  These medical records appear

at AR 487-515.  Witt's Mayo evaluation included consultations with a psychologist (Richard Seime) (AR 488-91); a neurologist (Dr. Weinshenker) (AR 494-95); an infectious disease physician (Dr. Terrell) (AR 496-97); and a pulmonologist (Dr. Cowl) (AR 498-501).  Dr. Cowl wrote a letter to Dr. Kirton dated October 2, 2012 which summarized the multi-system evaluation. AR 492.  The final diagnoses were:  probable fibromyalgia syndrome, hypertriglycerdemia, periodic lower extremity spasms and imbalance associated with subjective cognitive slowing, degenerative joint disease, elevated body mass index, probable sleep-related disordered breathing associated with abnormal overnight oximetry and probable obstructive sleep apnea, and aerobic deconditioning.  Id.

The Mayo team recommended Witt return for their comprehensive fibromyalgia treatment program.  AR 492.  She returned for further evaluation on October 24, 2012.  AR 506-515.  Her evaluation revealed she met the American College of Rheumatology ("ACR") criteria for fibromyalgia.  AR 509. The evaluator stated that "given her symptom severity, she would benefit from intensive physical and psychological rehabilitation through participation in Mayo Clinic's 3 week comprehensive Pain Rehabilitation Center program."  AR 510.  Witt agreed to participate in the Mayo half-day self-management program (AR 509) but declined the three-week intensive program.   AR 510.  The evaluator also recommended physical and occupational therapy because of Witt's difficulty ambulating.  Witt agreed to those recommendations.   Id.  The evaluator's diagnoses remained: (1) fibromyalgia; (2) depression; and

42

(3) abnormal sleep oximetry.  Id.  The ALJ concluded the Mayo evaluation as a whole was "consistent with an ability to perform light level work."  AR 29.

The ALJ summarized his reasoning for the RFC he assigned as follows:

Having considered the evidence in its entirety, the undersigned notes that the record generally supports a finding of no condition that has objectively limited the claimant beyond that referenced in the established RFC.  The claimant has presented over time with variability in terms of subjective complaints and exhibited variability in terms of, for example, gait dysfunction and muscle weakness.  Nevertheless, the evidence does not support a finding that the claimant's functioning has deteriorated below her light level baseline RFC for any full and continuous 12 month period.

As for the opinion evidence, the undersigned considered and [sic] State agency consultants' assessments which receive significant weight.  Their conclusions find support in the lack of verifiable objective findings reflecting deterioration over time to a degree precluding a range of light level activities.  Generally, the claimant's physical exams have been normal.  Moreover, she has exhibited give-way weakness with issues such as irregular gait and tremor noted as distractible.  Thus, her allegations are less than fully credible.

The claimant's treating physician, Dr. Kirton, MD, submitted a medical source statement dated October 4, 2012, noting limitations precluding even sedentary work, on a regular and sustained basis.  This assessment receives less weight.  It is, in large part, based upon the claimant's less than credible subjective complaints rather than on verifiable objective findings. Dr. Kirton described the claimant as unable to work in a March 2011 progress note due to variable functional status including issues involving dragging foot on the left side at times with slow speech and mentation at times.  He referenced support for a finding of disability as of the claimant's June 2011 assessment.  However, these reports likewise receive limited weight for reasons discussed throughout this decision.

AR 29-30.

### (a) Balance-related limitations

The RFC formulated by the ALJ and communicated to the VE indicated Witt was capable of "frequent" balancing. AR 24. This capability was not endorsed by Witt's treating physician (Dr. Kirton), who indicated Witt needed to use a cane or other assistive device due to imbalance and weakness. AR 485. It was likewise not endorsed by Witt's treating physical therapist (Brett Teveldal) who opined it was not safe for Witt to walk independently and prescribed a front-wheeled walker. AR 273. Dr. Susan Assam, Physical Medicine Rehabilitation Specialist, also opined "in regards to her ability to work, I think her balance would be very unsafe." AR 345.

The state agency consulting physician at the initial level indicated Witt was capable of balancing only occasionally because of her documented lower extremity weakness, parenthesis, and tremors. AR 73. At the reconsideration level, the state agency consulting physician assigned no balance restrictions. AR 85. It appears both the state agency consultants reviewed the medical records of Witt's treating physicians, but did not personally examine or treat Witt. AR 72-73, AR 84-85.

Witt asserts that given the medical evidence in the record, the ALJ's assignment of a "frequent" balancing limitation in the RFC is not supported by substantial evidence. The court agrees. The ALJ gave "significant" weight to the state agency consultants' opinions. But for the reasons discussed in Section 2 below, the ALJ's assignment of "significant" weight to the non-examining, non-treating state-agency consultants, while assigning "less" weight

to the opinions of Witt's treating physician (Dr. Kirton) is not supported by substantial evidence.

Further, a careful review of the ALJ's balancing limitation reveals that it is not supported by *any* medical evidence in the record.   One of the state agency consulting physicians assigned a limitation of "occasional" balancing (AR 73) while the other indicated Witt's balancing capability was "unlimited" (AR 85).   The ALJ effectively split the difference when he assigned a "frequent" balancing limitation.  In doing so, however, the ALJ substituted his own judgment for that of the medical professionals when he drew upon his own inferences to incorporate a medical restriction into Witt's RFC that was not endorsed by *any* medical opinion.  This was not permissible.  "An administrative law judge may not draw upon his own inferences from medical reports." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (citation omitted). See also, Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) ("an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").   For all of these reasons, the balancing restriction included in Witt's RFC was not supported by substantial evidence.

### (b) Fibromyalgia-related limitations

Next, Witt asserts the ALJ erred by failing to recognize any limitations posed by her fibromyalgia condition.  She contends that because the ALJ (correctly) acknowledged fibromyalgia as one of her severe impairments, there should necessarily have been associated corresponding limitations reflected in

her RFC.  Witt asserts the ALJ never mentioned fibromyalgia in his written decision after recognizing it as a severe impairment, and never acknowledged SSR 12-2p[5] (specifically addressing fibromyalgia and how to evaluate it).  Witt insists that because the ALJ instead incorrectly focused on the lack of objective findings, he necessarily erred in formulating her RFC.  The Commissioner does not contend the ALJ acknowledged or applied SSR 12-2p, but counters the ALJ exhaustively reviewed the medical evidence and properly found the record as a whole did not support Witt's allegations of disabling pain.

The Eighth Circuit has noted that fibromyalgia is a disease which is "chronic, and diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests . . . We have long recognized that fibromyalgia has the potential to be disabling."  Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).  Where the ALJ rejected a claimant's fibromyalgia symptoms and complaints because they were not "substantiated by objective medical testing" the Eighth Circuit reversed and remanded the case because the ALJ "misunderstood fibromyalgia" which likewise adversely affected the ALJ's formulation of the claimant's RFC analysis.  Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).

> Fibromyalgia is defined as a syndrome of chronic pain of musculoskeletal origin but uncertain cause.  Stedman's Medical Dictionary, at 671 (27th ed. 2000).  Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities."  Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005).  The American College of Rheumatology nonetheless has established diagnostic

_____

[5] SSR 12-2p was published and effective on July 25, 2012.  Witt's case was decided on December 5, 2012.  AR 32.

criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." Stedman's Medical Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010).

In Johnson as in this case, the ALJ gave little weight to the treating physician's opinion regarding the claimant's fibromyalgia and its effect on her ability to work. Johnson, 597 F.3d at 412. The ALJ rejected the opinion because it relied primarily upon the claimant's subjective complaints and lacked supporting objective medical findings. Id. Because of the unique nature of fibromyalgia, however, the First Circuit criticized the ALJ's reasons for giving little weight to the treating physician's opinion:

> Dr. Ali's "need" to rely on claimant's subjective allegations . . .was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming. Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)(internal punctuation and citation omitted). Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

Id. at 412 (emphasis in original). The court concluded by finding the RFC formulated by the ALJ was "significantly flawed." Id. See also, Rogers v. Commissioner of Soc. Security, 486 F.3d 234 (6th Cir. 2007).

In Rogers, the Sixth Circuit likewise reversed and remanded a fibromyalgia case. Rogers, 486 F.3d at 250. "[U]nlike medical conditions that can be confirmed by objective medical testing, fibromyalgia patients present no

47

objectively alarming signs. . . .[F]ibromyalgia  is an elusive and mysterious disease which causes severe musculoskeletal pain.  . . . [F]ibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion.”   Id. at 243-44 (citations omitted, punctuation altered).  In Rogers, the Court held the ALJ erred by adopting into the RFC limitations imposed by physicians who dismissed the claimant’s complaints because they were not substantiated by objective findings.  Id. at 244-46.  “[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant.”  Id. at 245.

As in Garza, Johnson and Rogers, it appears  the ALJ in this case effectively required objective evidence beyond the accepted clinical findings necessary for fibromyalgia.  As such, the ALJ misunderstood Witt’s fibromyalgia and as a result, he rejected its associated limitations which should have been included in her RFC.  Accordingly, the ALJ’s formulation of the RFC was “significantly flawed” and this case should be reversed and remanded.  Garza , 397 F.3d at 1089 ; Johnson, 597 F.3d at 412; Rogers, 486 F.3d at 243-44.

Social Security Ruling (“SSR”) 12-2p regarding the proper evaluation of fibromyalgia cases went into effect on July 25, 2012—before the ALJ in this case issued his written decision on December 5, 2012.  The Ruling carefully explains the specific criteria that should be considered both to establish the existence of the medical impairment of fibromyalgia and to evaluate the

48

credibility of a claimant's associated subjective pain complaints. "Although Social Security Rulings do not carry the force and effect of the law or regulations, . . . they are binding on all components of the Social Security Administration." Kosyjana v. Commissioner, Social Security Administration, 2014 WL 5308028 at *2 (D. Md. October 15, 2014) (citations omitted, punctuation altered).

SSR 12-2p describes the criteria for establishing a claimant has the medically determinable impairment of fibromyalgia. See, SSR 12-2p at p. 2-3. They include a history of widespread pain, at least 11 positive tenderpoints, and evidence that other disorders that could cause the signs or symptoms have been excluded. Id.

The Ruling goes on to caution that when determining the claimant's RFC, the longitudinal record should be considered whenever possible because the nature of fibromyalgia necessarily includes "symptoms    . . . that can wax and wane so that a person may have bad days and good days." Id. at p. 8.

The Ruling instructs consulting examiners to be aware that fibromyalgia symptoms "may vary in severity over time and may even be absent on some days . . ." Id. at p. 6. On remand, the ALJ should clarify how the application of SSR 12-2p affects the evaluation of the medical evidence and the formulation of Witt's RFC.

49

### (c) CMV-related limitations

Witt also asserts error because the ALJ did not clearly state whether he considered her CMV encephalitis infection[6] and its residual effects, if any, was in fact a medically determinable impairment and if so, whether any corresponding limitations should be considered for purposes of her RFC.  When determining a claimant's RFC, the ALJ must determine the limiting effects of *all* the medically determinable impairments, even those which are not severe. See 20 C.F.R. 404.1545(e).

On the third page of his written decision, the ALJ discussed (in Section 3) the impairments which he considered "severe."  AR 21.  Those impairments were:  Chiari I malformation, degenerative disc disease, fibromyalgia, and obesity.  The ALJ discussed all of those medically determinable impairments in the first paragraph of Section 3.  AR 21.  In the next several paragraphs of Section 3, (AR 21-24) the ALJ discussed several more impairments claimed by Witt:  CMV encephalitis infection (AR 21-22); carpal tunnel syndrome (AR 22);

---

[6] "Cytomegalovirus (CMV) is a common virus that can infect almost anyone.  Most people don't know they have CMV because it rarely causes symptoms.  However, if you're pregnant or have a weakened immune system, CMV is cause for concern.  Once infected with CMV your body retains the virus for life.  However, CMV usually remains dormant if you're healthy . . . **Symptoms in people with compromised immunity.**  An illness resembling infectious mononucleosis is the most common presentation of CMV in people with weakened immune systems (immunocompromised).  CMV can also attack specific organs.  Signs and symptoms include:  fever, pneumonia, diarrhea, ulcers in the digestive tract, possibly causing bleeding, hepatitis, inflammation of the brain (encephalitis), behavioral changes, seizures, coma, visual impairment and blindness.  Most people infected with CMV who are otherwise healthy experience few if any symptoms.  When first infected, some adults may have symptoms similar to mononucleosis, including fatigue, fever and muscle aches."  Source:  http://www.mayoclinic.org/diseases-conditions/cmv/basics/ Last checked Jan. 29, 2015.

migraine headaches and vision problems (Id.); concentration and memory problems (Id.); and depression and anxiety (AR 22-24).

The pertinent portion of the ALJ's discussion of CMV is as follows:

However, the infectious disease specialist stated he doubted the claimant ever had CMV encephalitis given it is a rare condition typically associated with AIDS patients with the CMV IgM test being fraught with false positives . . . The prior consultant also did not think any past possible CMV encephalitis would be contribute [sic] to the claimant's symptoms . . . The claimant was also clearly able to engage in SGA after the purported history of CMV encephalitis . . . Irrespective of any possible past CMV encephalitis, the objective evidence of record supports the established RFC.

AR 21-22. For most of the remaining impairments claimed by Witt which the ALJ discussed but which were not designated as "severe," he included language indicating he considered the impairment medically determinable, but not severe. See, e.g., regarding carpal tunnel: "the record fails to reflect any limitations in terms of the claimant's manipulative functioning," (AR 22); regarding migraines: "the record reflects a history of migraines controlled by Topomax," (Id.); regarding vision problems: "[T]he record does not support a finding of visual limitations more than minimally interfering with her ability to engage in basic work activities . . .Her additional eye examinations also did not reflect any significant visual deficiency." (Id.); regarding anxiety and depression: "However these did not cause more than minimal limitation in her ability to perform basic mental work activities and were thus nonsevere." (Id.).

"The court should not be required to speculate as to the basis for the ALJ's conclusion. To afford a proper review of his decision by [the] court, the ALJ's findings must be clearly stated on the record." Roy v. Secretary of Health

51

and Human Services, 512 F. Supp. 1245, 1252 (C.D. Ill. 1981).  On the other hand, "an ALJ's arguable deficiency in opinion-writing technique does not require [the court] to set aside a finding that is supported by substantial evidence."  Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  See  also, Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (deficiency in opinion writing does not require court to set aside administrative finding unless it has a bearing on the outcome).

In Reynolds, the Eighth Circuit determined that although the ALJ did not specifically delineate his reasons for rejecting the claimant's testimony, it was clear he made "implicit" determinations about her credibility.  Id.  The ALJ's conclusion regarding Witt's CMV encephalitis falls into the latter category. Although not the model of clarity, taken in context it is implicit the ALJ accepted the opinions of the Mayo Clinic doctors regarding the CMV encephalitis.  In other words, the ALJ accepted Witt's previous CMV encephalitis as a non-severe impairment, but attributed none of her current symptoms (and therefore no limitations for purposes of her RFC) to the CMV.

### (d) Chiari I malformation-related limitations

Witt's final argument regarding the RFC formulation pertains to her Chiari I malformation.  The ALJ accepted this condition as a medically determinable impairment that was "severe."  AR 21.    In the paragraph referencing the Chiari I malformation as a "severe" impairment, the ALJ cited the brain MRI dated July 13, 2011, which was ordered by Dr. Salem.  AR 21. The MRI report is found at AR 331.  It was ordered because of "memory loss."

Id.  Although the ALJ accepted Chiari I malformation as a "severe" impairment, he did make not further reference Dr. Salem's records.

Dr. Salem saw Witt in May, 2011.  AR 300-301.  He indicated he planned to order the brain MRI if other tests were unrevealing, then see Witt again in a few months.  AR 301.  The MRI occurred in July, 2011, but there are no further treatment notes from Dr. Salem.   A note indicates Witt did not return because she was going to the Mayo Clinic.  AR 303.  None of the Mayo Clinic reports, however, address the Chiari I malformation.

> Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. Normally the cerebellum and parts of the brain stem sit in an indented space at the lower rear of the skull, above the foramen magnum (a funnel-like opening to the spinal canal). When part of the cerebellum is located below the foramen magnum, it is called a Chiari malformation.
>
> CMs may develop when the bony space is smaller than normal, causing the cerebellum and brain stem to be pushed downward into the foramen magnum and into the upper spinal canal. The resulting pressure on the cerebellum and brain stem may affect functions controlled by these areas and block the flow of cerebrospinal fluid (CSF)— the clear liquid that surrounds and cushions the brain and spinal cord—to and from the brain.
> CMs are classified by the severity of the disorder and the parts of the brain that protrude into the spinal canal.
>
> ***
>
> Type I involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. Normally, only the spinal cord passes through this opening. Type I—which may not cause symptoms—is the most common form of CM and is usually first noticed in adolescence or adulthood, often by accident during an examination for another condition. Type I is the only type of CM that can be acquired.

53

\*\*\*

Individuals with CM may complain of neck pain, balance problems, muscle weakness, numbness or other abnormal feelings in the arms or legs, dizziness, vision problems, difficulty swallowing, ringing or buzzing in the ears, hearing loss, vomiting, insomnia, depression, or headache made worse by coughing or straining. Hand coordination and fine motor skills may be affected. Symptoms may change for some individuals, depending on the buildup of CSF and resulting pressure on the tissues and nerves. Persons with a Type I CM may not have symptoms. Adolescents and adults who have CM but no symptoms initially may, later in life, develop signs of the disorder. Infants may have symptoms from any type of CM and may have difficulty swallowing, irritability when being fed, excessive drooling, a weak cry, gagging or vomiting, arm weakness, a stiff neck, breathing problems, developmental delays, and an inability to gain weight.

Source:  http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm  Last checked Jan. 29, 2015.

Additionally, in December 2010, Dr. Zimprich cited the Chiari malformation as something that should be given "additional consideration" as the cause of Witt's ongoing and otherwise unexplainable tremors.  AR 246.  He likewise considered ordering another brain MRI.  Id.  After the July 2011 brain MRI, however, there is no further mention of the Chiari malformation in Dr. Zimprich's notes.  Dr. Mumm (rheumatologist) also noted Witt's Chiari malformation and the July, 2011 brain MRI.  AR 337-38.  He did not offer any insight as to how the Chiari malformation contributed (if at all) to Witt's symptoms.  Id.  All of these additional references to Witt's Chiari malformation in the medical records are purely academic, however, because the ALJ did not mention any of them in his decision or indicate he whether relied upon them in deciding the Chiari malformation was a severe impairment.

An impairment is "severe" if it significantly limits a claimant's ability to perform basic work activities.  See  20 C.F.R.  404.1520(c); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).   Because the ALJ accepted Witt's Chiari I malformation as a "severe" impairment, it follows that he must have believed it significantly limited her ability to function in the workplace. The medical record cited by the ALJ, however, (the July, 2011 MRI report) sheds absolutely no light on that subject.  Because the ALJ did not discuss any other medical record or provider notes in connection with the Chiari malformation, the court cannot determine how he decided it was a "severe" impairment, and what evidence he considered (if any at all)  regarding this "severe" impairment when formulating Witt's RFC.  "A clear articulation of both fact and law is essential to [the court's] ability to conduct a review that is both limited and meaningful."  Owens v. Heckler, 748 F.2d 1511, 1514-15 (11th Cir. 1984).   As for the Chiari I malformation, therefore, the court agrees the case should be remanded for clarification as to what significant limitation(s) it imposed upon Witt's ability to work and how those limitations were incorporated into her RFC.

## 2.  The Commissioner's Evaluation of the Medical Evidence

Next, Witt asserts the ALJ erred by giving "significant weight" to the opinions of the state agency physicians who did not examine or treat her, while giving "less" weight to her treating and examining physicians (Dr. Kirton and Dr. Assam) and treating physical therapist (Brett Teveldal).  Witt asserts the ALJ failed to give good reasons for rejecting the opinions of her

treating/examining medical providers.  The Commissioner asserts the ALJ

properly gave significant weight to the opinions of the non-treating, non-

examining state agency physicians in this instance because the treating

medical providers' opinions are inconsistent with the medical evidence as a

whole, and the opinions of the non-examining experts are supported by better

or more thorough evidence.

The ALJ's discussion of the medical opinion evidence is found on page

eleven and twelve (AR 29-30) of his written decision.  The ALJ stated:

> As for the opinion evidence, the undersigned considered [sic] and
> State agency consultants' assessments . . . which receive
> significant weight.  Their conclusions find support in the lack of
> verifiable objective findings reflecting deterioration over time to
> a degree precluding a range of light level activities.  Generally, the
> claimant's physical exams have been normal.  Moreover, she has
> exhibited give-way weakness with issues such as irregular gait and
> tremor noted as distractible.  Thus, her allegations are less than
> fully credible.
>
> The claimant's treating physician, Dr. Kenneth Kirton, M.D.,
> submitted a medical source statement dated October 24, 2012,
> noting limitations precluding even sedentary on a regular and
> sustained basis. . . . This assessment receives less weight.  It is, in
> large part, based upon the claimant's less than fully credible
> subjective complaints rather than on verifiable objective findings.
> Dr. Kirton described the claimant as unable to work in a March
> 2011 progress note due to variable functional status including
> issues involving dragging the foot on the left side at times with
> slow speech and mentation at times. . . He referenced support for a
> finding of disability as of the claimant's June 2011 assessment. . .
> However, these reports likewise receive limited weight for the
> reasons discussed throughout this decision.

"A treating physician's opinion is given controlling weight if it is well-

supported by medically acceptable and clinical laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence."  Reed

v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted, punctuation altered).  The treating physician's opinion may be discounted or disregarded where other opinions in the record are "supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. at 921 (citation omitted).

Conversely, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." Cox v. Apfel, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted).  "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." Id. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).

The factors to consider  for assigning weight to medical opinions are set forth by regulation:

> (d) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and

may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****.  When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

See 20 C.F.R. § 404.1527(d).

As to Witt's RFC, the ALJ gave "less weight" to the opinion of her treating physician (Dr. Kirton).  AR at 30.  The ALJ explained he gave Dr. Kirton's opinion "less weight" because (1) Dr. Kirton's opinion was based "in large part" on Witt's "less than fully credible subjective complaints rather than on verifiable objective findings" and (2) he discounted Dr. Kirton's other medical records "for the reasons discussed throughout this decision."  Id.   The only other discussion of Dr. Kirton's medical notes contained in the ALJ's written decision is found at AR 27 and 28.  The ALJ rejected the opinions expressed during Witt's June 2, 2011 visit with Dr. Kirton because the primary reason for that visit was not Witt's fibromyalgia.  Witt nevertheless wanted to talk about her disability claim that day.  Because "no significant physical assessment" was performed on June 2, the ALJ found the opinions expressed by Dr. Kirton on June 2 were not consistent with the record generally.  AR 27.  The ALJ

59

rejected the information contained in the remainder of Dr. Kirton's records (AR 28) because Witt's symptoms were "vague in nature" and not consistent with a single counseling record in which Witt indicated she felt "pretty good."  Id.

For the reasons explained in Section 1(b) above, and because Witt's primary severe impairment (fibromyalgia) is not susceptible to objective findings, the ALJ's insistence on objective findings in order to afford Dr. Kirton's opinion controlling or greater weight is not supported by substantial evidence.

That Dr. Kirton's March, 2011 and June 2011 medical records were rejected "for reasons discussed throughout this decision" is such a broad statement that it cannot qualify as a "good reason" to reject Dr. Kirton's opinion.  Reed, 399 F.3d at 921 (conclusory explanation for rejection will not be accepted as a "good reason.").  The court should not be required to speculate, without more, about what "evidence" the ALJ relied upon to reject the treating physician's opinion in favor of the opinion of a non-examining state agency physician.   Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011) (court should not be required to "speculate on what basis the Commissioner denied a  . . . claim.").

The ALJ did not specify what, if any weight he placed on the medical evidence in the record from Witt's rehabilitation specialist (Dr. Assam)[7] but

_____

[7] The ALJ indicated a perceived inconsistency because during Witt's well-woman/gynecological examination with Dr. Bhatia on April 11, 2012, (approximately one week before her examination with Dr. Assam on April 19, 2012) Witt did not exhibit tenderness or limited range of motion as she did when examined by Dr. Assam.  AR 28.  The ALJ concluded "the prior

60

specifically rejected the opinion of the treating physical therapist (Brett Teveldal).  AR 27.  On remand, the weight to be given the opinion of Witt's treating providers should be re-examined given the nature of her primary impairment (fibromyalgia).  If, after reconsideration, Dr. Kirton's opinion is not given controlling weight,[8] the weight to be afforded the treating providers' opinions  should be determined by considering all of the factors outlined in 20 C.F.R. § 404.1527(d) (treatment relationship, supportability, consistency, specialization, and other specified listed factors).

In the face of contradictory opinions from the treating physician, the opinion of a non-examining state agency physician's opinion who has examined the claimant once or not at all generally does not constitute substantial evidence upon which an ALJ may deny a claim.  Cox, 345 F.3d at 610.  See also, Anderson v. Barnhart, 344 F.3d 809, 812-13 (8th Cir. 2003) (generally consulting physician opinion does not constitute substantial evidence but there are two exceptions: (1) where the consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders

---

examination [with Dr. Bhatia] more accurately reflects her functioning and this is generally consistent with the records from Family Solutions Center . . ." Id. There is no indication Dr. Bhatia conducted an examination geared toward detecting signs or symptoms of fibromyalgia, or that Dr. Bhatia provided or was specifically asked to provide an opinion about Witt's RFC.  The court will therefore give the ALJ the benefit of the doubt by concluding he did not intend to suggest work-related physical limitations should or could be derived from a well-woman/gynecological exam.

[8] An "other medical source" such as physical therapist Teveldal's opinion can never be deemed a treating source whose opinion is afforded controlling weight.  See SSR 06-03p.  Other medical sources can, however, comment upon the severity of a claimant's medical impairment.  See 20 C.F.R. § 404.1513(a) & (d) and SSR 06-03p.

inconsistent opinions that undermine the credibility of such opinions). Because the fibromyalgia issue will require the ALJ to re-weigh the opinion evidence altogether on remand, the determination on remand should necessarily include whether and, if so why, the opinions of state agency, non-examining experts (Dr. Entwistle and Dr. Whittle) are supported by better or more thorough medical evidence.

Finally, Witt asserts the ALJ failed to properly evaluate the medical evidence because he failed to clearly articulate the weight given to the medical evaluations of her mental impairments.  On this score, the court disagrees.

"[T]he burden is on the claimant to show the existence of a disability on or before the date that the date that the insurance coverage expires." Basinger v. Heckler, 725 F.2d 1166, 1167 (8th Cir. 1984) (citations omitted).  First, Witt did not specifically claim any mental impairments as the basis for her disability.  See Disability Reports at AR 187-97, 218-236.[9]  In those reports, the conditions Witt listed as limiting her work capability were: cytomegalovirus, arthritis in the neck and lower back, carpal tunnel, vision

---

[9] The parties' stipulated facts indicate "Witt's, application for SSDI benefits protectively filed on February 1, 2011 alleg[ed]  disability since May 28, 2007 due to cytomegalovirus[9], arthritis in neck and lower back, bilateral carpal tunnel, vision problems, ***depression***, tremors, seizures, fatigue, shoulder problems, weakness in leg, obesity and fibromyalgia. AR 65, 164, 191, 193, 203-09, 220, 225, 226, 230, 231 . . ."  The only mention of depression in any of those record cites, however, is at AR 65 (the initial denial transmittal sheet which refers to Dr. Gunn's secondary diagnosis of affective disorder) and 193, where she listed a medication prescribed for depression. **When specifically asked on her initial and amended applications to list her physical and mental conditions that limited her ability to work, however, Witt did not cite any mental impairments.  AR 191, 220, 230.**

problems, (AR 191) and fibromyalgia (AR 220).  Second, Witt testified during the hearing that she believed her sole mental impairment (depression) was mild and well controlled by medication (Celexa).  AR 57.[10]

Nevertheless, the ALJ discussed Witt's various psychological evaluations in the record in some detail in his written decision, and concluded she did not have a "severe" mental impairment pursuant to 20 C.F.R. § 1520a(d)(1).  AR 24.  Specifically, he found  her claimed mental impairment only mildly affected her activities of daily living, social functioning, and concentration, persistence and pace, and that she'd had no episodes of decompensation for purposes of the "B" criteria pursuant to 20 C.F.R. § 404.1520a(d)(1).  AR 22-24.   He further acknowledged the "B" criteria are not a residual functional capacity assessment but are instead used to rate the severity of mental impairments at Steps 2 and 3 of the sequential analysis.  AR 24.  He indicated, however, that his RFC analysis reflected the degree of limitation he found in the "B" criteria mental function analysis.  Id.

The medical evidence reviewed by the ALJ included complaints of depression to Dr. Kirton (AR 376); a consultative examination by a psychologist, Dr. McGrath (AR 305); a geriatric neuropsychology evaluation with Dr. Whitten (AR 342); the Mayo Clinic behavioral medicine evaluation by psychologist Dr. Richard Seime (AR 488); and visits with her family doctor Bhatia (AR 447).

---

[10] Impairments that are controllable by medication do not support a finding of disability.  Collings v. Astrue, 335 F.3d 726, 729 (8th Cir. 2003).

Witt faults the ALJ for failing to specifically address the state agency experts' observations, which are found at AR 70-71 (Dr. Richard Gunn, Ph.D., State Agency Expert on initial denial); and AR 82-83 (Dr. Richard Buchkoski, Ph.D. , State Agency expert on reconsideration).  In both of those reports, the State Agency experts listed affective disorder[11] as a potentially severe impairment (AR 70, 82) but then in the narrative portion of the report explained that pursuant to the factors described in 20 C.F.R. § 1520a(d)(1) (the "B" criteria) and other factors, her affective disorder was deemed not severe. AR 71, 82.  The ALJ echoed this conclusion, although not by citing the State Agency experts' opinions.  Any error in failing to specifically cite their reports, therefore, was harmless.  Additionally, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).   For all of these reasons, the court perceives no error in the ALJ's review or the conclusions he reached regarding Witt's mental impairments.

### 3.  The Commissioner's Evaluation of Witt's Credibility

Witt asserts the ALJ failed to properly evaluate her credibility because he focused his credibility assessment almost entirely on the objective medical evidence.  Witt asserts that because her primary medical impairment

---

[11] "Affective disorders are a set of psychiatric diseases, also called mood disorders.  The main types of affective disorders are depression, bipolar disorder, and anxiety disorder."  http://www.healthline.com/health/affective-disorders#Overview1  Last checked Jan. 29, 2015.

See also  20 C.F.R. Pt. 404, Appx. 1 to Subpart P.,  § 12.04 Affective Disorders.

(fibromyalgia) is not susceptible to objective findings, the ALJ's credibility assessment was particularly flawed in her case.

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual." Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3). In this case, the ALJ's credibility analysis begins on page seven of his written decision (AR 25) It applies some of the Polaski factors and explains how they apply to Witt. AR 25-29. The ALJ is not required to "explicitly discuss *each* Polaski factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain." Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (4) dosage and effectiveness of medication; (5) precipitating and aggravating factors; (6) functional restrictions; (7) the claimant's prior work history; (8) observations by third parties;

(9) diagnosis by treating and examining physicians; (10) claimant's complaints to treating physicians.  See  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite Polaski but did cite 20 C.F.R. § 404.1529. Witt acknowledges the ALJ discussed her activities of daily living, her work history, and her medications, but she asserts the ALJ failed to connect his discussion of these factors to her credibility, as required by Polaski.  Witt's primary criticism, however, returns to the central theme of her appeal:  that the ALJ fundamentally misunderstands fibromyalgia because he "repeatedly looked for traditional objective findings rather than the symptoms and findings associated with fibromyalgia ."   See Witt's opening Brief, Doc. 12, at p. 24. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) ("It is well settled that an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them.").   The court agrees.

The ALJ found Witt had a good work history before her alleged onset date, but he found the evidence did not support a finding that her condition deteriorated causing any limitation greater than the RFC formulated by the ALJ. AR 25.  The ALJ considered Witt's statements regarding her own abilities and the third-party statement submitted by Witt's sister.  AR 25.  Both were consistent with Witt's allegations of disabling pain.  Because the ALJ did not find Witt's claims credible, however, he likewise did not find the third-party statement credible.  Id.

66

The ALJ reviewed Witt's visits with her neurologist (Dr. Zimprich), her family doctor (Dr. Bhatia), her treating physician (Dr. Kirton), her neurologist (Dr. Salem), her rheumatologist (Dr. Mumm), her physical therapist (Brett Teveldal), her physical medicine rehabilitation specialist (Dr. Assam), her counselor ( initials KS), her Mayo Clinic neurologic exam (Dr. Weinshenker), her Mayo Clinic pulmonary exam (Dr. Cowl), and her Mayo Clinic psychological exam (Dr. Seime). See AR 26-29. The ALJ particularly noted Witt demonstrated normal muscle strength, reflexes, range of motion, and/or gait. See AR 26( Dr. Zimprich); AR 26, 28 (Dr. Bhatia); AR 27 (Dr. Mumm); AR 28 (Dr. Assam).

The ALJ concluded his credibility finding by adopting the non-treating, non-examining state agency opinion which found Witt capable of light duty work because "their conclusions find support in the lack of verifiable objective findings reflecting deterioration over time to a degree precluding a range of light level activities. Generally, the claimant's physical exams have been normal. Moreover, she has exhibited give-way weakness with issues such as irregular gait and tremor noted as distractible. Thus, her allegations are less than fully credible." AR 29.

If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination. Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). Because the ALJ's credibility determination focused primarily on consistency of her pain complaints with the *objective* medical evidence, this is the rare case in which

the court cannot defer to the ALJ's credibility determination.  Rogers v.
Commissioner of Social Security, 486 F.3d 234, 247-48 (6th Cir. 2007); Swain
v. Commissioner of Social Security, 297 F.Supp.2d 986, 994 (N.D.Ohio 2003)
("the ALJ's credibility assessment placed undue emphasis on the absence of
objective medical evidence . . . given the importance of credibility findings in
fibromyalgia cases, the ALJ should reassess Swain's credibility giving due
consideration to the need to go beyond objective medical evidence in properly
evaluating such cases.").  For these reasons, the ALJ's credibility decision was
not supported by substantial evidence in the record.  Witt's credibility should
be determined anew upon remand.

## F.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is
not supported by substantial evidence in the record. The Plaintiff requests
reversal of the Commissioner's decision with remand and instructions for an
award of benefits, or in the alternative reversal with remand and instructions
to reconsider her case.

42 U.S.C. §  405(g) governs judicial review of final decisions made by the
Commissioner of the Social Security Administration.  It authorizes two types of
remand orders: (1) sentence four remands and (2) sentence six remands.  A
sentence four remand authorizes the court to enter a judgment "affirming,
modifying, or reversing the decision of the Secretary, with or without
remanding the cause for a rehearing."  42 U.S.C. § 405(g).   A sentence four
remand is proper when the district court makes a substantive ruling regarding

68

the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also, Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION and RECOMMENDATION

Based on the foregoing law, administrative record, and analysis, this court respectfully RECOMMENDS to the District Court that the Plaintiff's

69

Motion (Docket 11) be GRANTED in part as follows:  the Commissioner's decision should be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 30th day of January, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge